**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

**SHANNON DENISE NEWSOME,**

                **Plaintiff,**           **Civil Action No.**

**v.**

**TRANS UNION, LLC,**
**Serve: c/o Illinois Corporation Service**
      **Company**
      **801 Adlai Stevenson Drive**
      **Springfield, IL 62703**

**and SAFRA NATIONAL BANK OF**
**NEW YORK d/b/a ACCESS LOANS,**
**Serve: 546 Fifth Avenue**
      **New York, NY 10036**

               **Defendants.**

## COMPLAINT AND DEMAND FOR JURY TRIAL

Shannon Denise Newsome ("Plaintiff" or "Ms. Newsome") brings this action on an individual basis, against Trans Union, LLC ("Trans Union") and Safra National Bank Of New York d/b/a Access Loans ("Safra"); (all defendants collectively, "Defendants"), for actual, statutory, and punitive damages and costs, and attorney's fees, for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et. seq.*, and states as follows:

## INTRODUCTION

1.      The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service, or other institutions, allows information concerning individual consumers to flow instantaneously to

requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.      Unfortunately, this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, Defendant acknowledges this potential for misuse and resulting damage every time it sells its respective credit monitoring services to a consumer.

3.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.      These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.      Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.      "Credit is the lifeblood of the modern American economy, and for the American consumer access to credit has become inextricably tied to consumer credit scores as reported by

credit reporting agencies." *Burke v. Experian Info. Sols., Inc.*, 2011 WL 1085874, at *1 (E.D. Va. Mar. 18, 2011).

7.      Congress made the following findings when it enacted the FCRA in 1970:

(a)      The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

(b)      An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.

(c)      Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers.

(d)      There is a need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

15 U.S.C. § 1681(a)(1-4).

8.      Thus, one of the fundamental purposes of the FCRA is "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter." 15 U.S.C. § 1681(b). Accordingly, "[t]he FCRA evinces Congress' intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear 'grave responsibilities.'" *Cushman v. Trans Union*, 115 F.3d 220, 225 (3d Cir. 1997).

9.      The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

[W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make

him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

10. Since 1970, when Congress enacted the Fair Credit Reporting Act, as amended, 15 U.S.C. § 1681 *et. seq.*, ("FCRA"), the federal law has required CRAs to have in place and to utilize reasonable procedures "to assure the maximum possible accuracy" of the personal and financial information that they compile and sell about individual consumers.

11. The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

12. In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

13. The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items

of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

14.     Plaintiff's claims arise out of Trans Union's blatantly inaccurate credit reporting, wherein Trans Union reported to Plaintiff's potential creditors that Plaintiff had an outstanding balance and an amount owing and past due that was simply false.

15.     Accordingly, Plaintiff brings claims against Trans Union for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b), and failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and record the current status of the disputed information, or delete the disputed information from Plaintiffs credit file, in violation of the FCRA, 15 U.S.C. § 1681i.

16.     Plaintiff also brings a claim against Defendant Safra for failing to fully and properly reinvestigate Plaintiff's disputes and review all relevant information provided by Plaintiff and Trans Union, in violation of the FCRA, 15 U.S.C. § 1681s-2(b)(1).

17.     As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs, and attorneys' fees from Defendants for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq., as described herein.

## PARTIES

18.     Shannon Denise Newsome ("Plaintiff" or "Ms. Newsome") is a natural person residing in Alexandria, Virginia, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

19.     Defendant Trans Union, LLC ("Trans Union") is a limited liability company with a principal place of business located at 2 Baldwin Place, Chester, PA 19022, and has a registered

agent in the Commonwealth of Virginia. TransUnion conducts business throughout the Commonwealth, including within this District.

20.     Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

21.     Defendant Safra National Bank of New York d/b/a Access Loans ("Safra") is a national bank with its headquarters in New York which has a registered agent in the Commonwealth of Virginia. Safra conducts business throughout the Commonweath, including within this District.

22.     Safra is a credit grantor and "furnisher" of consumer information, as defined in 15 U.S.C. § 1681s-2(b).

## JURISDICTION AND VENUE

23.     This Court has federal question jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

24.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTS

**A.     Summary of the Fair Credit Reporting Act**

25.     The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

26.     The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

27.     Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

28.     To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

29.     The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

**B.**      **Factual Background**

30.      The United States Congress has found that the banking system is dependent upon fair and accurate credit reporting. Inaccurate consumer reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continual functioning of the banking system.

31.      Trans Union sell millions of consumer reports (often called "credit reports" or "reports") per day, which reports often include the sale of credit scores.

32.      Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like Trans Union, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

33.      Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like Trans Union, must maintain reasonable procedures to assure that consumer reports are sold only for legitimate "permissible purposes."

34.      The Trans Union's consumer reports generally contain the following information:

(a)      Header/Identifying Information: this section generally includes the consumer's name, current and prior addresses, date of birth, and phone numbers;

(b)      Tradeline Information: this section pertains to consumer credit history, and includes the type of credit account, credit limit or loan amount, account balance, payment history, and status;

(c)      Public Record Information: this section typically includes public record information, such as bankruptcy filings; and,

       (d)    Credit Inquiries: this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

35.    Trans Union obtains consumer information from various sources. Some consumer information is sent directly to Trans Union by furnishers.

36.    The majority of institutions that offer financial services (e.g., banks, creditors, and lenders) rely upon consumer reports from CRAs (like Trans Union) to make lending decisions.

37.    Those institutions also use FICO Scores, and other proprietary third-party algorithms (or "scoring" models), including debt-to-income ratios, to interpret the information in a consumer's consumer report, which is based on the amount of reported debt, payment history, and date of delinquencies contained in Trans Union's consumer reports.

38.    The information Trans Union includes in a consumer report contributes to a consumer's overall creditworthiness and determines their FICO Scores.

39.    FICO Scores are calculated using information contained in Trans Unio's consumer reports.

40.    Trans Union knows that FICO and other third-party algorithms (as well as the algorithms owned by Trans Union) use variables or "attributes" derived from a consumer's consumer report to calculate a "credit score," which is a direct reflection of a consumer's creditworthiness.

41.    Trans Union knows that lenders also consider a consumer's debt-to-income ratio (DTI) before deciding to extend credit or approve financing terms.

42.     DTI compares the total amount a consumer owes to the total amount a consumer earns.

43.     The higher the amount of reported debt that a consumer has, or appears to have, or is rather *reported* to have, the less favorable the consumer's DTI will be, and the more difficult it will be for a consumer to obtain credit and favorable credit terms. Rather, if offered credit at all, consumers will be offered less credit and at higher interest rates.

44.     Trans Union routinely reports inaccurate and materially misleading information about consumers like Plaintiff, without verifying or updating it as required by Section 1681e(b) of the FCRA.

45.     Trans Union fails to employ reasonable procedures to assure the maximum possible accuracy of the information that they report about consumers, including but not limited to, account balances, account statuses, payment histories, and payment statuses.

46.     Consumers have filed thousands of lawsuits and FTC and Consumer Financial Protection Bureau Complaints against Trans Union for its inaccurate credit reporting.

47.     Thus, Trans Union is on continued notice of their respective inadequate reporting procedures. Specifically, Trans Union is on notice that their inadequate procedures regularly result in the reporting of inaccurate balances, account statuses, payment histories, and payment statuses.

48.     Trans Union has received and documented many disputes from consumers complaining that Trans Union reported inaccurate information about them.

**C.     Plaintiff Discovered Inaccurate Information on Her Credit File**

49.     Plaintiff, a disabled military veteran, resides in Alexandria, Virginia, in a rental home, with her two young, minor children.

50.    Towards the end of 2022, Plaintiff began searching for a new vehicle because her at-the-time vehicle appeared to be on its last legs and in imminent need of a replacement.

51.    Accordingly, Plaintiff began searching for a suitable vehicle for herself and her family, namely, a minivan, that she would purchase.

52.    At the same time, Plaintiff was in the market to purchase a home of her own.

53.    Plaintiff has been watchful and careful with respect to her credit profile and standing for some time. Some years ago, Plaintiff had gone through a rough patch, particularly during the Covid-19 pandemic, which caused her to miss certain monthly payments on some credit obligations.

54.    Since then, however, Plaintiff has turned a corner credit-wise, and she has been making efforts to improve her credit score.

55.    Plaintiff understood that an improved credit score and credit profile would afford her increased and more beneficial credit opportunities generally, especially to obtain an auto loan that is affordable and at a favorable interest rate.

56.    Understandably, then, Plaintiff has been paying close attention to her credit profile and credit standing, which she has been monitoring closely to ensure that each of her past negative credit items was adequately resolved.

57.    Therefore, on or about January 2023, before submitting auto loan applications and shopping around for favorable mortgage loan rates, Plaintiff obtained and reviewed a copy of her credit reports in order to determine what areas she could further improve and repair.

58.    To Plaintiff's surprise and dismay, Plaintiff reviewed her Trans Union report that contained a Safra National Bank of New York account, Account No. 201863719XXXX, which

was opened in August of 2022 (the "Account"), with a current and outstanding balance of $845, in addition to a missed monthly payment for the month of December 2022.

59.     Plaintiff panicked, and quickly commenced an investigation. Plaintiff discovered that her employment's payroll deductions had an error that caused her payments to not go through, which caused Safra to not be timely paid, which, in turn, appeared to have cause the late payment and balance owed reflected on her Trans Union credit report.

60.     Plaintiff promptly made an effort to pay down the Account debt.

61.     On or about February 13, 2023, Plaintiff paid Safra $490 for the Account.

62.     On or about March 3, 2023, Plaintiff paid Safra $494.62, which payment fully paid the entirety of the debt she had owed on the Account.

**D.     Plaintiff's April 2023 Dispute to Trans Union**

63.     In or about April 2023, Plaintiff again reviewed her Trans Union credit report to confirm that the Account was accurately reporting as no longer owing any outstanding balance or amount past due.

64.     Plaintiff anticipated that, with an update to the Account reflecting her full payment of the Account debt, her credit score would increase, and her credit profile would improve, so that she would recommence her efforts to secure an auto loan and a mortgage loan.

65.     To Plaintiff's utter dismay, upon review of her Trans Union credit report in April 2023, Plaintiff noticed no difference or change from the reporting she had earlier seen in January 2023. Specifically, Trans Union was still reporting the Account with an active balance of $845, and indicating an amount that was past due.

66.     Worried that something was very wrong with her credit file, Plaintiff sent a dispute letter to Trans Union, via certified mail, and disputed the inaccurate reporting of the Account in her credit reports (the "April Dispute").

67.     Specifically, in the April Dispute, Plaintiff disputed the reporting of the Account as having a balance or amount that was past due, as she had already paid off the entire Account debt.

68.     Along with her April Dispute letter, Plaintiff enclosed a copy of her payments showing that he Account debt was paid off.

69.     Plaintiff requested that Trans Union reinvestigate the disputed information, correct the reporting, and remove all inaccurate information associated with the Account from her credit reports.

**E.     The Credit Bureaus' Method for Considering Consumer Credit Report Disputes**

70.     The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. See 15 U.S.C. § 1681i(a)(5)(D).

71.     The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

72.     That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro 2 Format" or "Metro 2."

73.     It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

74.     Metro 2 is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

75.     Metro 2 codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

76.     The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

77.     These ACDV "fields" have various titles for the many substantive areas into which the Metro 2 codes can be entered.

78.     Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

79.     The data furnishers then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. See 15 U.S.C. § 1681s-2(b).

80.     Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via e-OSCAR.

**F.      Trans Union's Unreasonable Dispute Reinvestigation**

81.     Upon information and belief, on or about June 10, 2023, Plaintiff received a dispute response from Trans Union regarding her April Dispute, which stated that that Trans Union had "VERIFIED [the disputed item] AS ACCURATE."

82.     Considering the Safra Account was still inaccurately reporting as owing a substantial balance and as having an active and current amount past due, and considering as Plaintiff has supplied her payment confirmations from Safra to corroborate the fact that she has paid off the Account debt, Trans Union did not conduct a reasonable reinvestigation of Plaintiff's dispute.

83.     Trans Union failed to conduct a reasonable investigation of Plaintiff's April Dispute to determine whether the disputed information was inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

84.     Thereafter, Trans Union continued to report and maintain in Plaintiff's credit file Plaintiff's Account information in the same way as it had before it received the April Dispute: with an $845 dollar balance and an indication that the Account owed an amount that was past due (together, the "Inaccurate Account Information").

**G.      Defendant Safra's Unreasonable Dispute Reinvestigation**

85.     Upon information and belief, in or about April or May of 2023, Defendant Safra received an ACDV from Trans Union and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff.

86.     Upon information and belief, Safra failed to review all relevant information provided by Tran Union regarding Plaintiff's April Dispute.

87.     Upon information and belief, Safra verified the disputed information as accurate to Trans Union in or about April or May of 2022.

88.     Safra violated 15 U.S.C. § 1681s-2b by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to modify, delete, or permanently block the disputed information that was inaccurate, incomplete, or unverifiable.

**H.     Plaintiff's CFPB Complaint Dispute to Trans Union**

89.     In or around May 2023, after spending an enormous amount of time and emotional labor scouring the internet for any assistance with respect to having an erroneous credit information removed from her credit reports, Plaintiff discovered that a consumer may file a complaint with the Consumer Financial Protection Bureau ("CFPB"), which may result in the correction of a credit error.

90.     Therefore, on or about May 19, 2023, Plaintiff submitted a CFPB complaint (Complaint No. 230519-11138138) to the CFPB, which forwarded the complaint to Trans Union.

91.     Her CFPB complaint disputed the Inaccurate Account Information, as reported by Trans Union.

92.     In response, Trans Union still refused to remove the Inaccurate Account Information.

93.     Upon information and belief, considering the information and documents available to Trans Union and the fact that Plaintiff had already paid off her entire Account balance and was not owing any outstanding balance on the Account and was not past due on any Account payments, Trans Union did not conduct a reasonable reinvestigation of Plaintiff's dispute.

94.     Upon information and belief, Trans Union failed to conduct a reasonable investigation of Plaintiff's CFBP Complaint dispute, or any reinvestigation whatsoever, to determine whether the disputed information was inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

95.     Thereafter, and upon information and belief, Trans Union failed to remove or delete the Inaccurate Account Information from Plaintiff's credit file and continued to report the Inaccurate Account Information in Plaintiff's credit file.

**I.      Plaintiff's June 2023 Dispute to Trans Union**

96.     In the interim, in or around May 2023, Plaintiff communicated with Safra directly and raised concern that her Safra Account was still being reported as past due with a balance owing. Plaintiff requested that Safra make sure to update and advise the credit bureaus that her Account debt had been fully paid off.

97.     In response, Plaintiff received an email from Safra on or about June 6, 2023, which confirmed to Plaintiff that the Account had been fully paid off as of March 3, 2023, and further assured Plaintiff that,

> We have reviewed our records and can confirm that we have appropriately furnished the most recent information regarding your loan status to the consumer reporting agencies. Most specifically, on April 13, 2023, and again on May 17, 2023, we submitted an update to the consumer reporting agencies reflecting that your loan was Paid-In Full on March 3, 2023.

98.     However, Safra's assurances were simply not reflective of reality—Trans Union was still reporting her account as being past due and maintaining an active balance of $845.

99.     Indeed, upon information and belief, Safra had itself confirmed and verified to Trans Union, in an ACDV related to Plaintiff's April Dispute, that the delinquent reporting was accurate.

100.    Therefore, in or about June 2023, exasperated that Trans Union had still not fixed its inaccurate reporting, Plaintiff sent another dispute letter to Defendant, via certified mail, and disputed the inaccurate reporting of the Account in her credit reports (the "June Dispute").

101.    Specifically, in the June Dispute, Plaintiff disputed the reporting of the Inaccurate Account Information.

102.    Plaintiff requested that Trans Union reinvestigate the disputed information, correct the reporting, and remove any Inaccurate Account Information.

**J.    Trans Union's Unreasonable Dispute Reinvestigation**

103.    On or about June 27, 2023, Plaintiff received a dispute response from Defendant regarding her June Dispute, which stated that Trans Union had "VERIFIED [the disputed item] AS ACCURATE."

104.    Considering the Safra Account was still inaccurately reporting as owing a substantial balance and as having an active and current amount past due, and considering as Plaintiff has supplied her payment confirmations from Safra to corroborate the fact that she has paid off the Account debt, Trans Union did not conduct a reasonable reinvestigation of Plaintiff's dispute.

105.    Trans Union failed to conduct a reasonable investigation of Plaintiff's June Dispute to determine whether the disputed information was inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

106.    Thereafter, Trans Union continued to report and maintain in Plaintiff's credit file Plaintiff's Account information in the same way as it had before it received the June Dispute: with an $845 balance and an indication that the Account owed an amount that was past due.

**K.    Defendant Safra's Unreasonable Dispute Reinvestigation**

107.    Upon information and belief, in or about June of 2023, Defendant Safra received an ACDV from Trans Union and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff.

108.    Upon information and belief, Safra failed to review all relevant information provided by Tran Union regarding Plaintiff's June Dispute.

109.    Upon information and belief, Safra verified the disputed information as accurate to Trans Union in or about June of 2022.

110.    Safra violated 15 U.S.C. § 1681s-2b by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to modify, delete, or permanently block the disputed information that was inaccurate, incomplete, or unverifiable.

111.    As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

**L.    Plaintiff Applies for an eBay Credit Card Issued by Synchrony Bank**

112.    In or about July 2023, Plaintiff was interested in securing a credit card and had been considering an eBay credit card for some time.

113.    On or about July 16, 2023, Plaintiff completed and submitted a credit card application to Synchrony Bank for an eBay Credit Card.

114.   Plaintiff anticipated that the eBay credit card and her anticipated timely monthly payments on that credit card would further bolster and improve her credit score over time.

115.   In order to make a determination regarding Plaintiff's credit card application, Synchrony Bank ("Synchrony") needed to obtain copies of Plaintiff's credit reports to evaluate her credit.

116.   Therefore, Plaintiff provided Synchrony with her personal identification information, including her Social Security number, and authorized it to obtain copies of her credit files.

117.   In July 2023, Defendant sold a credit report about Plaintiff to Synchrony in response to Plaintiff's credit application for the eBay Credit Card.

**M.    Synchrony Denies Plaintiff's Application for an eBay Credit Card**

118.   On or about July 8, 2023, Synchrony issued an adverse action notice to Plaintiff. Within that letter, Synchrony communicated that it had denied Plaintiff's credit application due to information reported by Defendant.

119.   Specifically, Synchrony's adverse action notice provided the following reason for denying Plaintiff's credit application: "Delinquent account(s) past due 30 days or more."

120.   At the time of the Synchrony Bank denial of credit, the Safra Account was the only active account that Trans Union was reporting in Plaintiff's credit report as maintaining an outstanding balance that was 30 days late or past due.

121.   At the time of the Synchrony Bank denial of credit, the Safra Account was the only non-closed account that Trans Union was reporting in Plaintiff's credit report as being 30 days late or past due.

122.    Trans Union's reporting was grossly inaccurate: Trans Union should not have reported to Plaintiff's credit file the Inaccurate Account Information.

123.    Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

**N.      Plaintiff's Inaccurate Credit File as of July 2023**

124.    Concerned about the state of her credit file, Plaintiff reviewed the contents of her July 1, 2023, credit file. Plaintiff was immediately distressed to see that Trans Union was still reporting the Inaccurate Account Information in Plaintiff's credit file.

125.    Upon receipt of each of Plaintiff's April Dispute and June Dispute, Trans Union was required to send a dispute notice, including, but not limited to, an ACDV, to the following furnishers regarding the following credit accounts disputed by Plaintiff: Safra National Bank of New York.

126.    Trans Union either failed to send a dispute notice, including, but not limited to, an ACDV, to Safra regarding the Inaccurate Account Information, or Safra verified to Trans Union that the disputed Inaccurate Account Information was accurately reporting on Plaintiff's credit report and/or in Plaintiff's credit file.

127.    Trans Union failed to conduct a reasonable investigation of Plaintiff's April Dispute and June Dispute, or any reinvestigation whatsoever, to determine whether the disputed information was inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

128.    Thereafter, and upon information and belief, Trans Union failed to remove the Inaccurate Account Information from Plaintiff's credit file and continued to report the Inaccurate Account Information.

129.    Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff even after it was on express notice of the disputed item.

130.    As a result of reporting the Inaccurate Account Information, Defendants made it practically impossible for Plaintiff to obtain credit.

131.    At all times pertinent hereto, Defendants were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendant herein.

132.    At all times pertinent hereto, Defendants conduct, as well as that of its respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

133.    As a standard practice, Defendant does not conduct independent investigations in response to consumer disputes. Instead, it merely parrots the response of the credit furnisher, despite numerous court decisions admonishing this practice. *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681(a) must consist of something more than merely parroting information received from other sources. Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information

is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at \*6 (S.D.N.Y. Nov. 19, 2008).  TransUnion has expressly been admonished by this court and others that its reinvestigation procedures do not comply with the FCRA and yet it has not modified such procedures.  *Mullins v. Equifax Info. Servs., LLC.,* 3:05CV888, E.D.Va. Jan. 18, 2006 (Tr. 84:2-85:25).

134.  Defendants are aware of the shortcomings of their procedures and intentionally choose not to comply with the FCRA to lower its costs. Accordingly, Defendants' violations of the FCRA are willful.

135.  Plaintiff was discouraged and stressed out by the Synchrony Bank eBay credit card denial because Plaintiff had been diligently working towards improving her credit score in order to qualify for certain necessary lines of credit like the Synchrony credit card.

136.  Plaintiff's car, which was already in need of replacement, suddenly broke down and became no longer operable in mid-June 2023.

137.  Plaintiff's vehicle had been her only mode of transportation, for herself and her minor children. Without the benefit of her vehicle, Plaintiff was forced to rely on the favors of others, on Uber rides, and other such costly, humiliating, and logistically challenging methods of transportation.

138.  Therefore, Plaintiff's efforts and drive to improve her credit and repair or remove adverse credit information was undertaken with a sense of critical urgency.

139.  Accordingly, Plaintiff was utterly devastated and significantly distressed to find that Trans Union was reporting a delinquent account, and then Trans Union had failed to correct its gross error even after receiving Plaintiff's disputes.

140.  Further, while Plaintiff had a measure of control over her other credit items and could work on repairing her overall credit, Plaintiff experienced a sense of helplessness and loss

of control over her credit because the Account delinquency could be removed only by Trans Union and Plaintiff could do nothing but submit disputes to Trans Union and Safra, which disputes, she had come to recognize, were not effective in the slightest.

141.    Plaintiff has refrained from submitting applications to auto loan lenders with the hope and anticipation that Defendants would correct their inaccurate reporting of the Account.

142.    Indeed, Plaintiff recognized and understood that an auto loan application submitted before Defendants corrected their inaccurate reporting may result in denial **and** an unnecessary hard inquiry on her reports that would further decrease and harm her credit score and reduce her chances of qualifying for and securing an auto loan.

143.    Therefore, when Plaintiff was left stranded with her two young children and without a vehicle, Plaintiff was forced to rely on Uber and vehicles that she occasionally borrowed from her friend and her adult daughter.

144.    Needless to say, Plaintiff's lack of a vehicle due to Defendants' erroneous reporting has caused her unnecessary embarrassment, distress, inconvenience, time, labor, and out-of-pocket costs.

145.    Still today, Plaintiff awaits Defendants' correction so that she may apply for an auto loan.

146.    As a direct result of Defendants' conduct, action, and inaction, Plaintiff suffered injuries resulting in actual damages including but not limited to loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional

distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy
### (First Claim for Relief Against Defendant Trans Union)

147.    Plaintiff relies on the allegations set forth in preceding paragraphs that are the factual basis for her claims that TransUnion violated the FCRA.

148.    The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure ***maximum possible accuracy*** of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

149.    On at least one occasion, Trans Union prepared patently false consumer reports concerning Plaintiff.

150.    Trans Union reported and published the Inaccurate Account Information to third parties, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness.

151.    Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

152.    As a result of Trans Union's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct

the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

153.    TransUnion has been on specific notice for nearly two decades that its procedures for assuring maximum possible accuracy are inadequate under the FCRA and has not significantly modified its procedures.

154.    Trans Union's conduct, actions, and inactions was willful, rendering them liable for actual and/or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

155.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II**
**15 U.S.C. § 1681i**
**Failure to Perform a Reasonable Reinvestigation**
**(Second Claim for Relief Against Defendant Trans Union)**

156.    Plaintiff relies on the allegations set forth in preceding paragraphs that are the factual basis for her claims that TransUnion violated the FCRA.

157.    The FCRA mandates that Trans Union conduct a reasonable reinvestigation of the accuracy of information "[i]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. *See* 15 U.S.C. § 1681i(a)(1). The FCRA imposes a 30-day time limit for the completion of such an investigation. *Id.*

158.    The FCRA provides that if Trans Union conducts its reinvestigation of disputed information and confirms that the information is, in fact, inaccurate or it is unable to otherwise verify the accuracy of the disputed information, it is required to delete the item of information from the consumer's file. *See* 15 U.S.C. § 1681i(a)(5)(A).

159.    Plaintiff initiated multiple disputes with Trans Union and disputed inaccurate information reporting in her credit file and requested that Trans Union correct and/or delete the inaccurate, misleading, and highly damaging information.

160.    Trans Union failed to respond to Plaintiff's dispute and conducted *no* investigation of Plaintiff's dispute, or such investigation, if any, that was so unreasonable as to allow patently false and highly damaging information to remain in Plaintiff's credit file. TransUnion has been on specific notice for nearly two decades that its reinvestigation procedures are inadequate under the FCRA and has not significantly modified its procedures.

161.    Defendant violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which it received notice of Plaintiff's dispute; and by failing to maintain reasonable procedures with which to filter and verify information in Plaintiff's credit files.

162.    As a result of Trans Union's conduct, action, and inaction, Plaintiff suffered injuries resulting in damages including but not limited to: loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

163.    Trans Union's conduct, actions, and inactions was willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court

pursuant to 15 U.S.C. § 1681n. Alternatively, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

164.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**<u>COUNT III</u>**
**15 U.S.C. § 1681s-2(b)**
**Failure to Conduct an Investigation of the Disputed Information and Review all Relevant Information Provided by the Consumer**
**(Claim for Relief Against Defendant Safra)**

165.    Plaintiff relies on the allegations set forth in preceding paragraphs that are the factual basis for her claims that Safra violated the FCRA.

166.    Defendant Safra furnished the inaccurate information relating to Plaintiff to at least one of the national credit bureaus, including but not limited to, Trans Union.

167.    Defendant Safra violated 15 U.S.C. § 1681s-2(b) by failing to investigate Plaintiff's disputes, or otherwise by failing to fully and properly investigate Plaintiff's disputes, including but not limited to failing to review all relevant information regarding the same; by failing to permanently and lawfully correct its own internal records to prevent the re-reporting of the inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to, Trans Union; and, by failing to cease furnishing inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to, Trans Union.

168.    As a result of Defendant Safra's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct

the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

169.    Defendant Safra's expressly confirmed directly to the Plaintiff in writing that its reporting of the Account was inaccurate, but despite this knowledge, it followed a procedure that failed to even look at information in its own records.  Therefore, Safra's conduct, action, and inaction were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

170.    Plaintiff is entitled to recover attorneys' fees and costs from Safra in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

a)  Determining that Defendant negligently and/or willfully violated the FCRA;

b)  Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

c)  Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

d)  Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Respectfully Submitted,

**SHANNON DENISE NEWSOME**

_____ _/s/_____
Susan M. Rotkis, VSB 40693
**CONSUMER ATTORNEYS**
2290 East Speedway Boulevard
Tucson, Arizona 85719
Telephone: (602) 807-1504
Fax: (718) 715-1750
Email: srotkis@consumerattorneys.com

*Attorneys for Plaintiff*
*Shannon Denise Newsome*